[No. 930. Decided August 5, 1893.]

HENRY BASH, *Respondent*, v. CULVER GOLD MINING COMPANY, *Appellant*.

APPEAL — REFEREE'S FINDINGS — NECESSITY FOR STATEMENT — CORPORATIONS — ESTOPPEL TO DENY CORPORATE EXISTENCE — CONTRACTS.

A stenographer's longhand notes of testimony taken before a referee in an action at law, and attached to and made a part of the referee's report, is sufficient on appeal, without the filing of a statement of facts.

Although steps have been taken to organize a corporation, the mere use of a corporate name, when there are no articles on file in any public office, will not constitute an estoppel to deny corporate existence, where one of the chief promoters of the company, who is cognizant of all the facts, seeks to charge the alleged corporation as party to a transaction with himself.

A corporation cannot be rendered liable upon a contract between stockholders prior to incorporation, when there is no corporate act recognizing such liability.

*Appeal from Superior Court, King County.*

*Burleigh, Gamble & Burleigh*, for appellant.
*Metcalfe, Little & Jurey*, for respondent.

The opinion of the court was delivered by

STILES, J. — This was purely an action at law, and therefore respondent's objections to the record are untenable.

The referee filed his report, and after hearing upon exceptions, the court rendered judgment as recommended in the report. Notice was given by appellant of the filing of a statement of facts, but no statement was actually filed, all that was done being the annexation to the referee's report of the testimony, of a certificate ready for the signature of the judge, such as it was usual to attach to a statement of facts. . Respondent moves to strike.

*Healy v. Seward,* 5 Wash. 319 ( 31 Pac. Rep. 874), would cover this case, were it not that this testimony was not in the shape of depositions, but was a stenographer's long-hand notes.     But we do not think these notes should be stricken, although they do not constitute a statement.     The statute, Code Proc., § 387, requires referees to file with their reports the evidence received upon the trial, which thereupon becomes a part of the record in the case, proper to be sent to this court without any statement at all, in an action at law, since the object of a statement in a law action is only to bring up matters not already a part of the record.     The motion is, therefore, denied.

The complaint alleged that the defendant became a corporation August 4, 1891, and set forth facts tending to show, in the first cause of action, that in January or February, 1892, plaintiff and others had sold and conveyed to it a mining claim, mill site, mill, etc., the consideration for which to the plaintiff was its agreement to pay him the money he had expended in the purchase of the mine, etc., and all his outlay in connection with it, which he summed up at $10,817.90.     The second cause of action was for $7,-662.80, alleged to have been advanced and paid by plaintiff for purchase of the mine and machinery and for mining work between August 4, 1891, the date of the incorporation and the close of that year, for the use of and at the request of the proper officers of the company, and which it promised to repay.     At the trial, however, without any amendment of the complaint, there was a great change of base as to the incorporation, it being sought most strenuously to establish that the corporation existed *de facto* at all times after February 11, 1891, and that all the money was paid out in the same manner as was alleged in the second cause of action as to the lesser part of it.

Now the facts were as follows: One J. L. Warner was a mining expert, and about January, 1891, he and one

Springer had procured from one Donohue an eight months' option bond upon the Culver mining claim, in Peshastin district, Kittitas county, for a consideration of $15,000, to be paid in the future. Springer was owner of a third interest in the bond, and Warner, for himself, and one Getchell, who was his financial backer, owned the other two-thirds. The claim was in litigation waged against Donohue, and Getchell had advanced money for the expenses of the suit. Warner and his brother, E. H. Warner, had an understanding by which they were jointly interested in whatever the former did in a mining way. Without, as far as we can see from the record, any unfair contrivance upon the part of the Warners, respondent and his son, C. B. Bash, and his son-in-law, B. M. Long, became desirous of having an interest in the mine, and as Getchell was tired of paying the costs of Donohue's litigation, it fell out that there was a preliminary arrangement between the Warners, Bashes and Long, looking to the joint acquisition of the whole property, and its development. Neither Warner nor Springer had money, but were expecting, if Getchell failed them, to enlist some other capitalist in the enterprise. Springer demanded $2,500 for a release of his third interest in the bond, and some $600 advances made by Getchell had to be repaid to him. Donohue was satisfied to take $13,000 for the mine, $1,000 cash and the balance in payments. Respondent, his son and Long undertoook to pay for the mine, for the erection of suitable machinery to work the ores to cost not exceeding $8,000, and for the cost of some development, and they were to have half the mine, and the Warners the other half. The Warners were not to have any interest in the mill until they paid for half of it. Something was understood about repaying the money, or part of the money, thus to be expended, of which more later. January 15, 1891, Springer and Getchell were satisfied. J. L.

Warner surrendered the bond to Donohue, and respondent received a deed from Donohue for the property, giving in return therefor $1,000, and a contract covering future payments of the purchase price.   This deed-ran to Henry L. Bash alone, as it appeared likely that he would be the one on his side of the transaction who would furnish all the money.   The next day respondent conveyed to E. H. Warner, for himself and brother, a half interest in the claim, and at the same time a written agreement was made, in which the Bashes and Long were parties of the first part, and E. H. Warner was party of the second part, as follows:

"Whereas, for and in consideration of one dollar to us in hand paid, and other valuable considerations, the parties of the first part agree to advance the money necessary for the purchase of the mine, and for the purchase, erection and operation of the machinery necessary for treatment of the ore from the Culver mine, with such money as may be necessary for the mining operations of said mine, provided such amount does not exceed eight thousand dollars for said machinery; the party of the second part agrees to supervise the purchase and erection of necessary machinery with such other supervision as may be necessary to the successful operation of mine and mill.

"The parties of the first part agree to execute a valid deed to an undivided one-half interest in the Culver mine alone to said party the second part, when called upon, and to an undivided one-half interest in said machinery when paid for by party of second part.

"It is further agreed that two-thirds of whatever net profits may accrue to the interest held by the party of the second part shall be set aside for the benefit of the parties of the first part, until one-half of the amount of money advanced by said parties of the first part shall have been returned to them."

At some time in this early stage of the transaction there was talk, among the parties to it, of the matter of forming a corporation which should take the title to the mining

claim, and carry on all the subsequent mining operations, including the acquisition of a mill and other necessary property, and that talk culminated in an agreement to incorporate, so that articles of incorporation were executed February 11, 1891, and later by-laws were drafted, and it was understood who the officers were to be.   But there was other litigation against the property, and it was deemed best not to file the articles for the present, and they were not filed until August 4th.   In the meantime J. L. Warner set two men at work at the mine, on February 16th, without any particular authority from anyone, as he had a perfect right to do, inasmuch as he was the owner in fee of one-fourth of it; and in May following regular mining work was commenced under his superintendence, with the full assent of respondent as per his letter of May 27th, as follows:

"*Jos. L. Warner*—I ask you to take charge of all my interests in the Culver mine from May 1, 1891, and manage all business in my room and stead as you may deem wisest and best."

From this time on, the work was prosecuted steadily, a mill was bought and erected, and the first ore was milled early in 1892, the respondent furnishing all the money for the various operations.   Numerous meetings were held prior to August 4th, at which the parties interested talked over the business and laid their plans, but no notice was taken of them in the form of corporate minutes, and there was but one series of facts which would lead anyone to suppose that a corporation was conducting affairs, viz.: J. L. Warner, in making purchases of supplies and employing men, used the name "Culver Gold Mining Co." to represent the responsible party for which he acted as "manager," and in some other ways the interested parties may be said to have held out to the public that there was a corporation of that name.   But whenever it became

necessary to give obligations for the payment of money it was done by individuals, and no corporate act was performed, nor any act which might not as well have been done by the parties interested as a partnership or a mere association. Among themselves there was no course of dealing which had any tendency to bind anybody to the theory of a *de facto* corporation; on the contrary, the plain purpose of all concerned was to avoid corporate existence until such time as the title to the mine should be cleared of litigation.

Respondent contends that this use of the name "Culver Gold Mining Co." should operate as an estoppel upon this appellant to say that it was not a corporation before any legal step had been taken to make it one. Such is not the law of corporations, however. Where, under statutes like ours, steps have been taken to organize a corporation, which are irregular, and there has followed a course of corporate action, there may be a *de facto* corporation, the existence of which cannot be denied either by itself or by those dealing with it. But the mere use of a name, when there are no articles on file in any public office where strangers can see them and be misled, will not constitute such an estoppel, and especially in a case like this, where one of the chief promoters of the company, who is cognizant of all the facts, seeks to avail himself of it. We think it was convenience alone which led to the use of the name, and that there was no corporation until September 26, 1891. We have noted that the original articles were filed August 4, and as to *bona fide* creditors there may have been a corporation from that time. But it was discovered a few days later that the time for the service of the trustees named therein had expired, without any organization having taken place, and the whole thing was abandoned, and new articles, with a new incorporator, one Clark, were executed and filed. Then, and never till then, was any corporate

meeting held or an organization effected, or minutes of a meeting made.   Whether any stock subscriptions were ever taken the record does not disclose, but it does appear that in the following January or February all parties (including Clark, who had received a conveyance of one-eighth of the mine from respondent) conveyed the mining claim and the mill site property to the appellant corporation in consideration of the issuance to them of the entire capital stock, of the nominal value of $200,000, in proportion to their interests in the mining claim.   In effecting this transaction there was not a scratch of a pen to show any corporate action authorizing it; it was simply done, and there it ended.   Respondent's conveyance of three-eighths of the property was upon the named consideration of "one dollar, and other good and valuable considerations," and. he claims that the real consideration was the issuance to him of three-eighths of the stock and the re-payment to him of all the money he had expended in the purchase of the mine and mill and the development work.   He does not produce a line of writing from anywhere to substantiate this remarkable proposition, nor any proof showing an agreement that he should be paid any money, but he goes back to the talks had with the Warners before the purchase from Donohue, and insists that it was always understood that he was to be repaid his entire outlay before anyone else should have anything, and he also proposes to entirely disregard the contract quoted above by claiming that it was only made for the protection of the Warners, and was never acted on.   How unjust this would be appears at a glance.   The record does not advise us as to the ownership of the stock of the company at the time the suit was commenced, and the attack seems to be mainly directed against the Warners, and we may assume that they still owned half of it, and ought to be charged with half the expenses, but it would not do to overlook the fact that re-

spondent voluntarily conveyed to Clark one-eighth of the property and that this eighth, now represented by stock, is proposed to be held liable the same as the rest. There may be other stockholders whose property would now be equally held subject to confiscation if this suit succeeds. Counsel points to some instances in which appellant seems to have paid, and to others in which it has assumed to pay, obligations for supplies furnished or work done on the mine before the conveyance; but what possible argument can that fact furnish that it assumed to repay what the former owners had expended?

Again, respondent had failed to pay Donohue $10,000 of the purchase money of the mine, and appellant, after suit had begun (whether to foreclose a vendor's lien or not is not shown), compromised the claim by payment of cash and promises of future payments. "Why not pay me, also?" argues respondent.

This mine, respondent seems desirous of having the court believe, is worth the par value of the appellant's stock, $200,000, and after appellant has bought it and paid for it there comes a claim of a former owner that he has been paid only a small portion of the price which respondent contracted in writing to pay. How can respondent base any claim on the fact that appellant pays off his dishonored obligation, and protects its immensely valuable property from sacrifice? Any proposition that a corporation should thus repay to former owners of a mine the money expended in the original purchase and the development of it, should be carefully scrutinized, and the demand should not be yielded to unless the contract is clearly made out. In this instance, assuming that respondent's agreement to furnish the money necessary to prosecute the work has been fulfilled, the company, upon its receiving the conveyances, and turning over its stock, was left without a dollar to work with, and no means of obtaining money except by borrowing; yet it is demanded that it forthwith pay

eighteen thousand dollars and upwards to its principal incorporator for money expended while the property belonged to him.

True respondent paid out considerable sums of money after September 26th, but with the exception of one very small item all of them were paid on obligations made by respondent himself long before that date. The contract of January 16th unquestionably measured the rights of both parties to it; and none of the payments made appear in anywise inconsistent with the obligations thereby entered into by respondent except the small sums used to pay the expenses of the incorporation.

Respondent says this contract was made simply to protect the Warners, and he is probably correct, for they were making a good bargain, and were anxious to have the terms of their agreement in writing. By the transaction with respondent they had transformed a two-thirds interest in a mere option to buy the Culver mining claim into a full title to half of the claim and the right to require respondent to pay the purchase price of the claim, the cost of machinery not exceeding $8,000, and the expenses of the necessary mining operations. The conveyance of half the mine to them would have been sufficient for their purpose, had the acquisition of title been the only thing to be considered; but they knew the property was not paid for, and that without money for mining development and machinery their title would result in no profit. This money respondent had agreed to furnish, and the only sensible way was to put the entire contract into writing. Respondent now seems to think this was a hard bargain for him, but it probably did not look so at the time he made it; and if his own suggestion as to the present value of the property is to be accepted, it is not a hard bargain for him now, since he has a profit on his investment of more than three hundred per cent. in stock of the company.

There was a finding that the company had produced

gold bullion worth $12,000, and it is claimed that respond-- ent should have that much anyway.   But a mere casual consideration of the matter must show the fallacy of such a proposition.   If the consideration for respondent's conveyance was a promise to repay him his entire outlay, it was a debt due and payable without regard to the production of bullion.   If the agreement was to pay him out of "profits," the mere production of bullion does not show profits; at the commencement of the suit there were more debts than the bullion produced amounted to.   And if the agreement had reference to the original contract with the Warners, it was limited to two-thirds of the net profits accruing to the Warners' interest (one-third of the whole) until respondent should receive back one-half of this money outlay.   But, as was said before, there is no evidence of any agreement with the corporation, and it is not responsible for the fulfillment of contracts between its promoters unless its agreement to do so is clearly made out.

The case presents a remarkable instance of unbusinesslike proceedings, even after the formal organization.   Respondent may be correct as to his view of what was originally contemplated, but if so, his own neglect has contributed as much as anything to his present condition. Holding absolute control of the purse, he was always in a position to have his rights defined and openly recognized; but in the face of the written contract he solemnly entered into, his version of conversations ought not to be accepted to the extent of charging appellant.

It is conceded that respondent should have what money he expended to organize the corporation, for a stock book, etc.

Judgment reversed, and a new trial ordered.

SCOTT, ANDERS and HOYT, JJ., concur.

DUNBAR, C. J.— I dissent, and will at some future time give my reasons for so doing.